RETTA STERLING, Respondent, v. THE HEAD
CAMP, PACIFIC JURISDICTION, WOODMEN
OF THE WORLD, a Corporation, Appellant.

No. 1548. (80 Pac. 375.)

1. **Mutual Benefit Insurance: Action: Complaint: Sufficiency.**
A member of a fraternal benefit society, desiring to change the
beneficiary to his fiancee, stopped paying dues and assessments for six months, and applied for membership, and the
issuance of a certificate to his wife; he having married in
the meantime. The member died three months after application, without having qualified as a member, and without
having paid the monthly dues and assessments, though he
paid his initiation fee. The second certificate was sent to
the local camp clerk for delivery to the insured when duly
signed, and on payment of dues and assessments. The
certificate and laws provided for a change of beneficiary by
surrender of the old certificate and payment of a fee therefor, and made the payment of dues and assessments and the
taking of the obligation conditions precedent to liability on
a certificate. In an action against the order by the member's
widow, she declared on both certificates; asserting a right
to recover on the first certificate on the theory that deceased
was ignorant, and, in changing the beneficiary, was misled
by defendant's local camp clerk, and was advised to cease
paying dues and assessments, thereby becoming delinquent,
and then to reunite with the order, and that because of the
misdirection his delinquency should be excused. The second certificate was claimed to be an executed contract, and
deceased was alleged to have been at his death a member
of the order, in good standing. *Held*, that the court erred
in overruling demurrers to the complaint on the ground that
it was not certain whether plaintiff sought to recover on the
first or second certificate, and, if on the first, she could not
recover, she having no interest therein, and that it was not
certain whether plaintiff sought to recover because of the
wrong of the camp clerk in misdirecting the deceased,
whereby he became delinquent, or whether she sought to recover only on the second certificate, as an executed contract
of insurance.

2. **Same: Election of Causes of Action.**
When plaintiff rested her case, defendant moved that she be required to elect on which certificate she proposed to stand. Thereupon her counsel stated. "We are not seeking to recover on one certificate any more than on the other," but claimed to recover, however, only on one. *Held.* that the refusal to require the plaintiff to elect was error.

3. **Same: Evidence: Admissibility: Errors: When not Cured by Charge.**
Errors in the admission of evidence that the deceased did not understand the constitution of the defendant and the first certificate as to a change of beneficiary, and requested a member of the lodge to interview the local camp clerk in regard thereto, and as to what the clerk said, were not cured by a charge that the first certificate was forfeited for nonpayment of dues and assessments, and submitting to the jury questions relating alone to the second certificate, where there was a direct conflict between the plaintiff and witnesses for defendant as to matters bearing on the second certificate.

4. **Same: Change in Beneficiary.**
Where the contract of insurance between a fraternal order and a member provided for a change of beneficiary by surrender of his old certificate, an attempt to make a change without following such provisions is not excused by failure of the member to understand his contract.

5. **Same: Power of Local Lodge Officer.**
The laws, rules, and regulations of a fraternal order, stipulating that the local camp clerk has neither express nor implied authority to waive the terms of the contract, are binding on the member.

6. **Same: Member Presumed to Know Rules.**
A member of a fraternal order is presumed to know and understand its rules and regulations.

7. **Same: Constitution: By-Laws: Construction.**
Where a certificate of insurance was never received by, nor delivered to, the insured, nor signed by the applicant or local officers of the lodge pursuant to the positive terms of the application and laws of the society, making such delivery and signatures conditions precedent to the liability of the order thereon, the contract of insurance was inoperative.

**8. Same:**

The constitution of a fraternal order, providing that a member who has been suspended for more than six months must apply for membership on the same terms and conditions as any person who has not been a member, except that he shall not be required to be again formally introduced in the ritual, does not exempt such member from taking an obligation, required by the order as a condition precedent to membership agreeing to pay all dues and assessments, and that he is in sound health.

**9. Same:**

Where the payment of monthly dues and assessments was made a prerequisite to liability of a fraternal order on its certificates of insurance, but the laws provided that, in case of sickness and inability to pay, the member, by notifying his camp, would be kept in benefit under certain conditions, the failure for three months preceding a member's death to pay dues and assessments is fatal to the liability of the order on a certificate, in the absence of any such notice.

**10. Same: Tender: Evidence.**

In an action on a fraternal benefit certificate, evidence *held* insufficient to show a tender of dues and assessments.

**11. Same: Tender, When Excused.**

In an action on a fraternal benefit certificate, a contention that a sufficient tender of dues and assessments was excused, because of testimony of the lodge clerk that a good tender alone would not have authorized him to deliver the certificate in suit, and that he would not have delivered it until the applicant was obligated and the certificate signed by the camp commander, is untenable, where the tender was not the only condition precedent to give effect to the contract of insurance.

BARTCH, C. J., dissenting.

(Decided March 30, 1905.)

Appeal from the Third District Court, Salt Lake County.—*Hon. T. D. Lewis,* Judge.

Action to recover a death benefit. From a judgment in favor of the plaintiff, the defendant appealed.

REVERSED.

*Messrs. Lee & Sweet* for appellant.

A contract of insurance never becomes complete until the last act necessary to be done by either party has in fact been done, although one side or the other may conditionally bind itself by a proposition, which when unconditionally accepted ripens the negotiations into a contract. Bacon's Ben. Soc., sec. 272; Niblack Ben Soc., sec. 139, p. 280; Joyce on Ins., sec. 70; Ray v. Ins. Co., 126 N. C. 166; McDonald v. Ins. Soc., 108 Wis. 213; Reese v. Ins. Soc., 111 Ga. 482; Pottsville Ins. Co. v. Minngua Co., 100 Pa. St. 137; Post v. Ins. Co., 52 N. Y. Sup. 910; McClavee v. Life Soc., 55 N. J. Law, 187; Ins. Co. v. Rudolph, 45 Tex. 454; Wilcox v. W. O. W., 76 Mo. App. 573; Aid Ass'n v. Brochter, 91 N W. 379 (Neb. July, 1902); Ormond v. Ass'n, 96 N. C. 158, 1 S. E. 796; McLendon v. W. O. W., 64 S. W. 36, 106 Tenn. 695, 52 L. R. A. 444; Benefit Soc., sec. 274.

*J. E. Frick, Esq.,* and *G. M. Sullivan, Esq.,* for respondent.

STRAUP, J.—Appellant is an incorporated fraternal and beneficial society, on the lodge plan. John C. Sterling in October, 1898, became a member of the lodge, and there was issued to him a benefit certificate, which will be called number 1, and in which Elizabeth Lowery was named the beneficiary, and by the terms of which she was entitled to participate in the benefit fund, to the amount of $2,000, upon the death of the said Sterling. The latter part of 1900 said Sterling, contemplating marriage with the plaintiff, desired to change the name of the beneficiary in said certificate to plaintiff's name. The certificate and the constitution and by-laws of the order provide that, if a member desires a change of any beneficiary, he shall deliver to the clerk of his camp his benefit certificate, with instructions indosed thereon stating the change and the

name of the new beneficiary, and a request to the head clerk to cause a new benefit certificate to be issued, to cancel the existing certificate, and a requirement that he make a certain payment therefor. Thereupon the clerk of his camp forwards said certificate so endorsed to the head clerk, who in this case was at Denver, Colorado, who thereupon prepares a new certificate, and forwards it to the camp clerk for signature by the local consul commander and the applicant before delivery. It also appears that, by the express terms of the said benefit certificate and the constitution and by-laws of the order, the said Sterling was required to pay certain dues and assessments every month in advance, in order to be in good standing and to keep alive the said certificate. These he paid and kept in good standing to and including the thirty-first day of December, 1900. He paid no more dues or assessments thereafter. On July 23, 1901, he made written application for membership and benefits in the same camp; and, so far as material here, his application therefor reads as follows: "I hereby make application for membership and benefit upon my life as follows." Then follows declarations to the medical examiner, and concerning his history and health and other matters; a request that the benefits be paid to plaintiff; and then: "I waive for myself and beneficiary all claims for benefit under this application until I shall be approved by the head physician, shall be regularly introduced, and shall deposit an assessment and such other amounts as are required by the constitution and by-laws, and receive a certificate of membership in the order." This application was signed by him. His initiation fee of $5 was paid. In accordance with the rules of the order, his application was favorably received, and the applicant approved by the head physician. On the twenty-ninth day of July, 1901, a certificate, in which plaintiff was named as beneficiary, was signed by the head camp, defendant herein, by its head consul, at Denver, and was forwarded to the

clerk of said local camp at Salt Lake City to be signed
by the local consul commander, camp clerk, and the
applicant, before delivery, which said certificate was
received by the said clerk about July 31st.  On August
1st the said Sterling was notified to appear at the
lodge rooms on August 6th for initiation, but he failed
to do so.  He was also notified to be at Saltair Beach
on August 7th, and there to be initiated.  There is
proof that he was at the beach on said date, but the
proof is not sufficient that he presented himself for in-
itiation; but, to the contrary, there is proof that he did
not do so.  And the evidence also shows that the camp
in which he sought membership did not then initiate
any one at the beach.  But it is an admitted fact that
the said Sterling was not initiated nor obligated, nor at
all introduced, after his said application for renewal of
membership was made.  Regular meetings of the camp
in which he sought membership were held every Tues-
day evening in Salt Lake City, where the applicant re-
sided, but he did not present himself at any of such
meetings, nor did he at all attend any one of them.  Nor
did he deposit or pay any camp dues or assessments of
any kind.  The said Sterling died the thirteenth day of
December, 1901.  But no dues or assessments of any
kind had been paid by him after November 19, 1900.
The said certificate, No. 2, was not signed by the local
consul commander, nor by the applicant, and was not
delivered, but remained in the hands of the local camp
clerk at the time of Sterling's death.  By express pro-
visions of the said certificate, the laws of the society
were made a part thereof.  Among other things, the
certificate, as well as the laws of the society, provided
that the applicant shall faithfully keep his agreements,
and pay all assessments and dues that may be levied
during the time he shall remain a member; that the
said member must be in good standing at the time of
his death according to the constitution and laws of
the head camp and the by-laws of the camp of which
he is a member, as a condition precedent to the right

of any beneficiary to receive any benefit whatever upon his death; that any member who fails to pay his camp dues or benefit assessments shall stand suspended, and, until and unless reinstated, neither he nor his beneficiary shall be entitled to any rights or privileges of a member of the order; that any person, to become a benefit member of any camp, must pay to the clerk of the camp an introduction fee, to include certificate fee to the head camp, and one advance benefit assessment. It is also provided by the constitution and by-laws that, in making application for membership, it shall contain the clause contained in deceased's application, "I waive for myself and my beneficiary all claim for benefit under this application until I shall be approved by the head physician, shall be regularly introduced, and shall deposit an assessment and such other amounts as are required by the constitution and by-laws, and receive a certificate of membership in the order." It is further provided that a candidate must present himself for adoption within four weeks after notice of his acceptance, or forfeit his entrance fee, unless excused by a two-thirds vote of the camp, but in no case can more than three months elapse from date of certificate. It is further provided, "The liability of the head camp to any benefit member shall not commence until his actual introduction to the protection degree, receipt of his benefit certificate, and the payment by said member of an introduction fee, camp dues and advance assessment or assessments levied and payable during the month of his introduction, and receipt of certificate." By section 10 it is further provided that "a member of any camp who has been suspended for more than six months cannot be reinstated, but if he then desires to renew his membership in the order he must surrender his benefit certificate or make affidavit of its loss or destruction and apply for membership under the same terms as any person who has not been a member of the order except that he shall not be required to be again formally introduced in the ritual of the protec-

tion degree.'' It is also provided: ''Any benefit member of any camp who, while in good standing, becomes sick or disabled and on account thereof is unable or finds it difficult to continue payment of assessments and camp dues during illness or inability may nevertheless continue to be in good standing under the following terms and not otherwise, viz.: Prior to becoming delinquent he shall notify the clerk of his camp of his illness or disability and a desire that the camp maintain him in good standing and deliver to the clerk a certificate of a physician concerning his illness and the nature thereof. The clerk, on being satisfied that such illness exists, shall notify the consul commander and banker. In such case he shall not be required to pay any camp dues during such illness, but the same shall be paid to the head camp from the general fund. To obtain benefit of this section members must give notice to the clerk before they become delinquent except in such extraordinary cases of sudden illness or accident to the member in good standing which renders it impossible for the member to give the notice before becoming delinquent.''

Plaintiff testified that on August 7 or 8, 1901, the said Sterling took sick, but was able to be out and around. It was further shown the deceased was a painter in the employ of the Rio Grande Western Railway Company, and worked every day during the month of August except six, and up to and including the third day of September. It was shown by the attending physician that Sterling's first symptoms of final illness began September 3d. No claim or pretense is made that the said Sterling or the said plaintiff, or any one else, notified the clerk of his camp of his illness, nor was any certificate of a physician concerning the same furnished or provided, or any notice given or desire expressed that he was unable or found it difficult to make payment of his assessments or dues. The clerk of the camp, however, testified that some time during the month of September he learned of the

illness of Sterling, but there is nothing to show that he knew the nature thereof or any circumstances whereby Sterling, on account of said illness, was unable to or found it difficult to make payment of his benefit assessments or dues, or any desire that the camp keep him in good standing. It was further shown by the testimony of plaintiff that about a month after her marriage with Sterling, which was in January, she was present and heard a conversation between Sterling and the local camp clerk, in which Sterling asked what they were going to do about the policy (referring to the old policy, number 1); that the clerk replied some one had been there to pay on his policy, but that he did not accept the money, and Sterling said, "All right," and walked out; that she was present at another conversation had between said parties on the evening of August 6, 1901, in which the following took place (on direct examination): "Q. What did your husband say with reference to offering to pay for that death assessment, and the amount of money that was due upon the receipt of the policy? A. Why, he offered to pay for it. Q. Did he have the money there? A. Yes, sir. Q. How do you know he had the money there? A. Because I gave it to him. Q. Where did you get the money? A. I got it where I worked." Upon cross-examination she stated concerning the same conversation: "Q. Now, state what was said at that conversation? A. My husband asked him, how about his policy. He said he did not know he had to be initiated again, and McKellar [the clerk] told him that he would have to go to Saltair to be initiated over. Q. Well, did he tell him anything else? A. Not that I know of. We were there just a second. . . . Q. And your husband agreed to go, and did go? A. Yes, sir." On redirect she testified: "Q. Mr. Sterling had the money there to pay? A. Yes, sir. Q. Now, as I remember, you said on direct examination that he offered to produce the money? A. He did. Q. Do you remember

the words that were used? A. I don't know that I can tell the words that were said. Q. Did he offer to produce the money? A. He had it there in his pocket, and he put his hand in his pocket. Q. At that time they were conversing about the matter as to why he had to go to Saltair? A. Yes, sir. Q. Mr. McKellar didn't refuse to deliver him his policy because he wasn't being paid for it at that time? A. No, sir."

The clerk testified that he was ready to make him his certificate as soon as Sterling came in and entered the proper way, and paid him his money; that he was ready to execute the contract of insurance if he had been obligated in the camp. "I don't mean when he had been formally introduced in the ritual degree, but when he had taken the obligation."

While plaintiff claimed to recover only upon one certificate, nevertheless in her complaint she, in effect, declared upon both—on number 1 on the theory that the deceased was unlearned, and not familiar with the terms of his contract providing the method of change of beneficiary, and was misled in that regard by the camp clerk, who, as it was alleged, told him that said change could not be had without first surrendering the existing certificate, which the deceased was unable to do, and that, because thereof, he was advised to cease paying dues and assessments, thereby becoming delinquent, and then reunite with the order, when a new certificate could be taken out, and that because of said misdirection, his delinquency should be excused, and his first certificate declared operative. On number 2 it was claimed that it was an executed contract, and deceased, having offered to do all that was required of him to be reinstated, thereby became and was at the time of his death a member of the order in good standing. To this complaint a demurrer was interposed, both general and special, upon the grounds, among others, that it was not certain whether plaintiff sought to recover on the first or the second certificate, and if, on the first, she could not recover, because she was not the

beneficiary named therein, and had no interest in the same, and that it was not certain whether plaintiff sought to recover because of the wrong of the camp clerk misdirecting the deceased, whereby he became delinquent, and therefore the plaintiff should have declared the first certificate operative or whether she sought to recover only upon the second certificate, as an executed contract of insurance. These demurrers were overruled. Issue was made upon all the material allegations of the complaint, and at the trial both certificates were admitted in evidence, and plaintiff, over appellant's objection, was permitted to give evidence on her theory as to certificate number 1. When she rested her case, appellant moved that plaintiff be required to elect upon which certificate she proposed to stand. Thereupon her counsel asserted, in substance, the theories as above stated, and that "we are not seeking to recover upon one certificate any more than upon the other," but claimed to recover, however, only upon one. The court refused to require the plaintiff to elect. We think the ruling of the court upon this motion and upon the demurrers was error.

Over appellant's objection, plaintiff was permitted to introduce testimony on the subject that the deceased did not understand the constitution and his contract of insurance number 1, relating to a change of beneficiary, and that he requested a fellow member of the lodge to interview the local camp clerk in regard thereto, and what the said clerk stated. This was error. The contract of insurance provided for the change or substitution of beneficiaries in a certain way, hereinbefore set forth, and all other methods are excluded, and a substitution which is not in substantial compliance with the method provided is invalid. A. O. U. W. v. Gandy, 63 N. J. Eq. 692, 53 Atl. 142; Head v. Cath. Knights, 64 Mo. App. 212; Wendt, Adm., v. Legion of Honor, 72 Iowa, 682, 34 N. W. 470.

It clearly was made to appear under the laws and rules and regulations of the society that said camp

clerk had neither express nor implied authority to waive, change or abrogate such important and material terms of the contract of insurance. Nor had he such authority by virtue of being clerk. Graves v. Modern Woodmen of America (Minn.), 89 N. W. 6; McCoy v. Ins. Co., 152 Mass. 272, 25 N. E. 289. To allow him to do so, and thereby bind appellant, in such case as this, would be announcing a doctrine beyond all limit. ''While the authorities are neither uniform nor satisfactory upon the question as to how far the acts of the agent will bind an insurance company, yet we think it may safely be asserted that an agent cannot bind his principal beyond the express grant of his authority where the extent of such authority is within the knowledge of the party dealing with such agent. In the absence of knowledge as to the extent of the authority, the agency may, under most of the decisions, bind to the extent of the apparent scope of the authority, but this rule has its limitations. If a party seeks admission into a mutual benefit order, he goes in as a member, and is presumed to have examined the laws and regulations which control the organization in which he is about to enter, and thereby subjects himself to such laws.'' Benefit Order v. Jones (Okl.), 50 Pac. 165. The deceased having been a member of the camp for several years, for a much stronger reason must it be presumed its rules and regulations were known and understood by him; and he must be held bound by the express terms of his contract, providing in what manner he might change or substitute a beneficiary in his certificate. There cannot be one construction of a contract, or an excuse for noncompliance with its terms, for a party unlearned, and another construction, or a requirement of compliance with its terms, for a party more learned. When it is claimed that these plain and positive terms of the contract were waived or abrogated, or that the deceased was induced to not comply therewith, it must be shown that it was done by some one in authority so to do, and for whose acts appellant

is responsible, which in this case is not even pretended. When the court, however, finally submitted the case to the jury, he charged them that the said certificate number 1 became forfeited for nonpayment of dues and assessments, and was void, and submitted to the jury questions relating alone to certificate number 2. But the said errors were not cured thereby. Inasmuch as there was a direct conflict between plaintiff and witnesses for appellant, relating to the tender of money, and other things bearing on the second certificate, the jury, by reason of this evidence wrongfully admitted, might well have considered it to appellant's prejudice, and, by reason thereof, resolved these other matters in favor of the plaintiff. While it was competent to admit the fact of deceased once having been a member and the holder of a benefit certificate as bearing on his application and right to a renewal membership, the allegations in the complaint, and the testimony in support thereof, go far beyond any such claim, and go to the right of plaintiff to recover on the said first certificate.

But it is contended by respondent that, notwithstanding all these matters, when the deceased, on the twenty-third day of July, 1901, made application for membership, he then having been suspended for more than six months, under section 110 of the constitution, heretofore quoted, he was entitled to such membership without being required to be reobligated; that there is sufficient proof to show that, after the said certificate number 2 had been received by the local camp clerk, the deceased had done all that was required of him to do; that he had made a tender of all that was due by way of assessments and dues, and had demanded a delivery of said certificate, but that the said local camp clerk wrongfully refused to deliver said certificate to him on the ground that deceased had not been reobligated, and therefore the deceased was excused from making any further tender of moneys due on account of dues or assessments; and that although the said certificate number 2 was not signed by the local consul com-

mander or clerk or by the deceased, and although it had not been delivered, still it should be declared an executed contract, and plaintiff be permitted to recover thereon. The trial court, holding with respondent in these contentions, charged the jury, in effect, that the deceased was not required to be reobligated, and that when his renewal application was accepted, and medical examination approved, then, "it became the duty of the clerk of such camp to sign such certificate, and have the same signed by the proper officer of the local camp, and sealed with the seal of the local camp, and to deliver the same to Sterling upon his signing the same, and paying the monthly dues, assessments, and equalization fees required." The court further charged the jury that if the said Sterling "requested the possession of the said certificate, and tendered and offered to pay the said clerk the dues and assessments required by the rules of defendant to be paid upon receipt of same, then he would be deemed to have done everything required to complete the contract of insurance, and the same, in law, would be complete." The court further charged the jury that if the said Sterling was ready, able, and willing to pay the dues and assessments required for the months of September, October, and November, 1901, but was prevented from doing so by reason of the refusal of "the company defendant" to deliver the said certificate, then the deceased was excused from paying the same. Appellant requested the court to direct a verdict for it, but this was refused. Plaintiff had a verdict for the full amount of the policy, with interest, less unpaid dues and assessments. The giving of these instructions, and the refusal of the court to direct a verdict, are now complained of.

It is contended by appellant that Sterling at the time of his death, was not a member, because not obligated, and not having paid one assessment, and, even if he was not required to be obligated, still he was not a member in good standing, in not having paid the requisite dues and assessments for the three

months preceding his death, and, with much force, urges that the certificate was not a completed contract, because not signed by the local consul commander or by the deceased, and, because of the express stipulations between the parties, the delivery of the certificate was made a condition precedent to give it effect, and therefore it never had any force, and never became an executed or completed contract between the parties. We think appellant's position is sound. By the clear and positive terms of the application for membership and for a certificate, as well as by the laws of the society, it was stipulated between the parties that the receipt of the certificate by the deceased(that is, a delivery thereof to him) was made a condition precedent to any right of the insured or his beneficiary in or to the certificate, and before any liability of appellant thereunder commenced. In such case the certificate, not having been delivered, did not become a completed or operative contract. It was so held under identical stipulations and laws of the society as are here under consideration. Wilcox v. W. O. W., 76 Mo. App. 573. The following cases hold the same doctrine: Kohen v. Life Assn. (C. C.), 28 Fed. 705; Misselhorn v. Reserve Fund (C. C.), 30 Fed. 545; McLendon v. Woodmen of the World, 106 Tenn. 695, 64 S. W. 36, 52 L. R. A. 444; Ray v. Ins. Co., 126 N. C. 166, 35 S. E. 246; Reese v. Fidelity, etc., Assn., 111 Ga. 482, 36 S. E. 637; McClave v. Mutual Reserve, etc., Assn., 55 N. J. L., 187, 26 Atl. 78; Taylor v. A. O. U. W. (Sup.), 29 N. Y. Supp. 773; Roblee v. Masonic Ass'n (Sup.) 77 N. Y. Supp. 1098; Coker v. Ins. Co. (Tex. Civ. App.), 31 S. W. 703; Newcomb v. Fund Soc. (Colo. App.), 38 Pac. 61; Ins. Co. v. Scurry, 50 Ga. 48; Marks v. Life Ins. Co., 117 Mass. 528; Bacon's Ben. Soc., section 277; Niblack's Ben. Soc., section 139. Many other cases holding likewise are quoted and cited in volume 59, Gen. L. Jour. 28-31. This holding, we think, is the general and almost universal doctrine. We are cited to Cooper v. Ins. Co., 7 Nev. 116, 8 Am. Rep. 705, where it is claimed an insurance policy was held operative,

though not delivered. But on a careful reading of the case nothing will be found that there the delivery of the policy, by any stipulation between the parties or otherwise, was made a condition precedent to give it effect. Lorscher v. Knights of Honor, 72 Mich. 316, 40 N. W. 545, 2 L. R. A. 206, is also cited. But there it was held, "under the constitution and regulations of the order, when the supreme lodge signs a benefit certificate, and forwards it to the subordinate lodge, the contract is complete." But how unlike is such a case to the one here, where the constitution and regulation of the order, and the stipulation in the application for a certifi-cate, expressly provided that the certificate should not become operative, and the liability of the defendant was not to commence, until the certificate was delivered, and where, too, the certificate was required to be signed not only by the local commander, but by the applicant himself, before delivery! We are cited also to Ins. Co. v. Babcock (Ga.), 30 S. E. 273, 42 L. R. A. 88, 69 Am. St. Rep. 134. But there it was expressly held, "Actual delivery of the policy to the insured is not essential to the validity of the contract of life insurance, unless expressly made so by the terms of the contract." Pledger v. W. O. W. (Tex. Civ. App.), 42 S. W. 653, tends somewhat to support respondent in her contention. But that case is referred to in Wilcox v. W. O. W., supra, and was not followed. Moreover, in the Pledger case it was said: "We do not think that the actual delivery of the certificate was made a condition precedent by the constitution and by-laws of the order," which indicates that no different holding as to the law is announced. The difference seems to be one of fact rather than of law. It certainly must be conceded that it was competent for the parties to stipulate when and upon what conditions their proposed contract should become operative and take effect, and could have conditioned it upon delivery of the contract, payment of premiums, some fixed time, or any other reasonable condition; and when the parties have done so, in such clear

terms as here, courts should not seek means to contra-
vene and frustrate the terms of such stipulations, and
thereby defeat the intention of the parties, thus plainly
expressed. Furthermore it is here shown that under
the laws of the society the said certificate was required
to be signed by the local consul commander and by the
deceased before it was ready for delivery, neither of
which was done. "The stipulation that the policy should
be countersigned by the agent of the company prior to
the time of its becoming a valid and binding obligation
was one which the company clearly had the legal right
to make, and is in no sense oppressive or unconscion-
able; and the completion of the contract with the signa-
ture of the agent during the lifetime of the insured was
essential to the existence of an obligation which could
be enforced against the company." Newcomb v. Fund
Soc. (Col. App.), 38 Pac. 61; Giddings v. Ins. Co., 102
U. S. 108, 26 L. Ed. 92. Until the certificate was so
signed and delivered, the transactions were no more
than pending negotiations and proposals toward the
making of a contract, but which in fact had not ripened
into a completed or executed contract. If the local camp
clerk was the agent of the defendant in this matter, then
the said certificate did not become operative whilst it
was in his hands undelivered, for his possession was
that of his principal, the defendant, and so long as it re-
mained in his hands the defendant had not parted with
its dominion over the certificate, but still retained such
dominion.

It is said the deceased was not required to be re-
obligated, had tendered all that was due for his certifi-
cate, demanded that it be delivered to him, and did all
that was required of him to do for a completed con-
tract, and that the local consul commander should
have signed it and delivered it, and that the court
was therefore authorized to treat the contract, as he did,
as a completed contract. To do this is in the face of the
stipulation that the certificate was not to become opera-
tive, nor the liability of the appellant to commence, un-

til it was delivered. And the further objection to this contention is that it takes at least two parties and the meeting of two minds, to make a contract. We know of no principle of law where it can be said that because one party to a proposed contract had done everything to express entire willingness to enter into and make it, but the other party, no matter whether from refusal or neglect, had not done so, therefore the court can treat the proposed contract as completed, and as though in fact made, and declare something existing which in fact had no existence. Where there are conditions precedent to the completion or giving effect to a contract, they must be fulfilled or waived before rights in or to the contract can vest or be legally asserted. The maxim that "equity regards that as done which ought to have been done" can here have no application, as contended for by counsel. Osterman v. Grand Lodge (Cal.), 43 Pac. 412; Giddings v. Ins. Co., 102 U. S. 108, 26 L. Ed. 92.

With these views, appellant was entitled to have a verdict directed for it, even though the deceased was not required to have been re-obligated, and even though his tender of payment should be sufficient. Still, so far as we are able to gather from the laws of the society, section 110 of its constitution does not mean that a member who had been suspended for more than six months is not required to be re-obligated, in order to renew membership on his application. The said section provides that he must "apply for membership on the same terms as any person who has not been a member of the order except that he shall not be required to be again formally introduced in the ritual of the protection degree." The terms "introduced" and "protection degree," of course have here a technical meaning, and a meaning especially appropriate to the society. While this technical or special meaning has not been defined to us with such clearness as we would have liked, and in order to enable us to determine just what is embraced within it, yet sufficient is made to appear that the so-

called obligation is quite apart from the contention counsel make. That is to say, while the applicant was not required to be formally initiated or instructed in the secret work of the protection degree or of the order, nevertheless he was required to take the obligation that he will guard the interests of the camp, and pay all dues and legal assessments; that he has not been rejected by or expelled from any camp of the order; and that he is in sound bodily health. And unless this obligation is taken, under the laws and rules of the society, when all its provisions are considered, the applicant cannot be said to have become a member. It can readily be seen that the exaction of these obligations or promises is just as requisite from such suspended member applying for membership as from a person who has not been a member. Considerable evidence was introduced, showing that the general practice of the order was that such suspended member applying for membership was in every case obligated. There was no evidence showing the contrary, or any evidence to show that such suspended member was ever permitted to renew his membership without being again obligated.

But even though it could be said that the deceased was not required to be re-obligated, and that his membership was renewed without it, yet there is much force to the contention that at the time of his death he was not a member in good standing, under the rules and regulations of the society, because of his default in not paying the dues and assessments required of him to be paid thereafter, and for the three months preceding his death. The evidence shows he did not bring himself within the provisions heretofore quoted, whereby he was exempt from these payments on account of illness.

Nor do we think the evidence sufficient to show a tender of money as by law required to constitute a good tender in payment of the amounts due, and as a condition precedent to the delivery of the certificate. The only tender claimed was that of August 6th, the evidence of which has heretofore been set forth. We

think this falls short of a good tender. Hunt on Tender, sections 234, 419, 471; Englanders v. Rogers, 41 Cal. 420. The contention of the respondent that a better tender was excused, because of the clerk's testimony, in effect, that a good tender alone would not have authorized him to deliver the certificate, and that he would not have done so until the applicant was obligated and until the certificate was properly signed by the consul commander, and that therefore the applicant was not required to do a mere vain thing, might have force, were that the only condition precedent to give effect to the contract of insurance.

For the reasons above expressed, we think the court erred in his instructions, and erred in not directing a verdict for appellant. The judgment of the court below is therefore reversed and vacated, and the cause remanded for a new trial in accordance with the views herein stated. Appellant is given its costs on appeal.

McCARTY, J., concurs.

BARTCH, C. J. (dissenting).—Upon a careful examination of the record herein, I am unable to agree with the majority in reversing this case. According to this ruling, a local agent, by neglecting or refusing, through design or otherwise, to perform a mere ministerial act, can defeat and render void a contract entered into by his principal, although his principal and the other contracting party have agreed upon its terms, and have done and offered to do, in good faith, everything necessary for them to do to make it valid and operative. This is not a case where a member, of his own volition, permanently leaves the order, and for that reason refuses to pay his dues and live up to the constitution and rules of the fraternity, but one where the member, in good standing, and holding a valid certificate, upon becoming married, was anxious to simply change his beneficiary, and substitute his wife, so that, in case of his death, she, to whom, in the very nature of things, he was more closely bound than to anything else upon

earth, might have something for her maintenance when he could not longer contribute to her support. All the while it was clearly his intention to continue his fellowship with the lodge, which was well understood by the officers thereof; and with that intention, as appears from the evidence and the record, he sought from the clerk of his camp—the agent of the defendant—the course to be pursued to effect the change as to the beneficiary, and followed the course which the agent devised. Then having entered into another contract with the defendant pursuant to such advice, this same agent, according to this decision, was able to, and did, defeat and render void not only the original contract, but also the new one in which the change was to be effected by simply refusing to obtain the performance of a mere ministerial act by an officer of the lodge, who, as appears from his statements in evidence, would have countersigned the certificate if it had been presented to him. The whole transaction, on the part of the deceased was but an effort in good faith to provide for his wife; and the party with whom he was contracting, and who mislead him, now succeeds in defeating the provision intended for the object of his affection. His failure, under the circumstances, to take the oath which he had previously taken, ought not to be held, under section 110 of the constitution of the order, to have been a condition precedent to his right to receive the new certificate. The transaction in question had not relieved him from his previous obligation. In conscience he was still bound; and that the oath was a part of the ritual of the protection degree to me seems clear. The exception of section 110 therefore relieved him from again taking the obligation.

To my mind, the ruling herein savors neither of justice nor fair dealing. Nor do I regard it as in accordance with the principles of law and equity applicable to such a case. That this judgment will work a miscarriage of justice—the very thing which is the foundation of law—I have no doubt. If such a contract,

made under such circumstances as are disclosed by this record, can be defeated by mere technicalities, what assurance can any member of the lodge have that after he is dead his beneficiary will receive the intended bounty? Surely the result of this case is not in accord with the benevolent object of the order.

For these and other reasons suggested by the record and briefs of counsel, I dissent.